IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-00240-01-CR-W-FJG |
| | ) | |
| KENNETH L. RICHEY, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on the Motion of Defendant Kenneth L. Richey to Suppress Physical Evidence. For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On August 20, 2004, the Grand Jury returned a one count indictment against defendant Kenneth L. Richey. The indictment charges that on or about February 5, 2004, defendant intentionally manufactured between 200 and 300 grams of methamphetamine.

On January 21, 2005, an evidentiary hearing was commenced on defendant's motion to suppress. Defendant Richey was represented by retained counsel Ronald Partee. The Government was represented by Assistant United States Attorney Joseph Marquez. The Government called Detectives Thomas Shroyer, I.B. Fugate III and Scott Chubick of the North Central Missouri Drug Task Force as witnesses.

The record was left open at the request of defense counsel so that additional testimony could be obtained. On March 31, 2005, defense counsel advised that defendant had no further evidence

to present.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Detective Thomas Shroyer is certified by the State of Missouri as a clandestine methamphetamine technician. (Tr. at 3) As a law enforcement officer, Detective Shroyer has come into contact with people in possession or manufacturing methamphetamine on numerous occasions. (Tr. at 3-4)

2. On February 4, 2004, Detective Shroyer went to the Wal-Mart in Richmond, Missouri at approximately 10:30 p.m. (Tr. at 4) Large quantities of cold medicine containing ephedrine, which is a precursor used in the production of methamphetamine, had been stolen from the Wal-Mart over the previous two to three weeks. (Tr. at 4-5) As a result of these thefts, officers had been visiting the Wal-Mart on a regular basis to look for people who might be committing the thefts. (Tr. at 5)

3. While watching the cold medicine aisle via the security cameras, Detective Shroyer and Detective Walton, another officer with the North Central Missouri Drug Task Force, observed a white male and a white female grab several boxes from the cold medicine aisle. (Tr. at 5) Detective Walton stayed in the security room to continue observing the white male and white female. (Tr. at 5) Detective Shroyer walked out into the store to see how many boxes of pills had been taken from the cold medicine aisle. (Tr. at 6) Detective Shroyer saw the white male and white female pushing one shopping cart. (Tr. at 6) Detective Shroyer observed four boxes of cold medicine pills in the cart. (Tr. at 6) Individuals may only purchase two boxes of cold pills containing pseudoephedrine at one time. (Tr. at 6)

4. After approximately twenty minutes, Detective Shroyer observed the white female heading to the checkout counter with two boxes of pills. (Tr. at 6-7) Detective Shroyer lost sight of the white male. (Tr. at 6-7) Detective Shroyer exited the store so that he could see which vehicle they would be driving. (Tr. at 7) From the security room, Detective Walton observed the white female proceed to the checkout counter and pay for her items. (Tr. at 7) Detective Shroyer observed the white female enter a white Jeep when she exited the store. (Tr. at 7) Detective Walton observed the white male walk around the store for three to four more minutes and then proceed to the checkout counter and pay for his items. (Tr. at 7) Detective Shroyer then observed the white male exit the store and enter the white Jeep. (Tr. at 8)

2

5.  Detective Shroyer contacted the Ray County Sheriff's Department to advise that an investigation was being conducted on two subjects had split up to buy cold pills containing pseudoephedrine separately. (Tr. at 8) Sergeant Scott Enss[1] and Detective Chris Clariday of the Ray County Sheriff's Department stopped the Jeep as part of the investigation to identify the parties inside the car. (Tr. at 8, 10)

6.  Sergeant Enss advised Detective Shroyer that the white male driver, identified as Kenneth Richey, had consented to a search of his vehicle. (Tr. at 10) Sergeant Enss observed several Wal-Mart sacks in the back of the vehicle, four boxes of cold medicine pills with the receipts and a police scanner. (Tr. at 10) The subjects were allowed to continue on their way. (Tr. at 10)

7.  Detective Shroyer notified the other units, Detective Fugate, Captain Guffey and Detective Chubick, of the identities of the people inside the white Jeep. (Tr. at 11) Detective Shroyer recovered the security tapes along with the receipts of the items bought at the Richmond Wal-Mart and went home for the evening. (Tr. at 11) Other officers continued the investigation that evening. (Tr. at 11)

8.  Detective Fugate and his captain, Robert Guffey, conducted a drive-by of Kenneth Richey's residence at 200 West Center in Polo, Missouri, to see if Richey had gone home after the vehicle stop or if he had gone to another location. (Tr. at 31) The white Jeep was at the residence. (Tr. at 32) The officers did not see any activity in the residence that evening. (Tr. at 32)

9.  The next morning, Detective Fugate and Captain Guffey again drove by Kenneth Richey's residence. (Tr. at 32) As they approached the stop sign in front of the residence, the officers noticed a very strong odor of ether in the area of the residence. (Tr. at 32) The officers noticed the smell even though their car windows were up. (Tr. at 35) Detective Fugate is a certified meth lab technician and has received training in methamphetamine detection. (Tr. at 32)

10. Captain Guffey drove around the block and Detective Fugate got out on foot and walked past the residence to ensure that it was the location from which the smell was coming. (Tr. at 35) Detective Fugate testified that as he walked down West Center approaching Kenneth Richey's driveway, he could smell a strong odor of ether, but as he got closer to the northwest corner of the house, the smell intensified. (Tr. at 36-37) Detective Fugate noted that the wind was blowing from the northeast to the southwest, that is away from the residence. (Tr. at 37-38) Detective Fugate walked

---

[1]Contrary to Defendant's Supplemental Suggestions in Support of Motion to Suppress Physical Evidence, Sergeant Scott Enss did not resign from the police force nor was he charged with child molestation. (Tr. at 9) Rick Enss, Sergeant Enss' brother, resigned from the Richmond Police Department. (Tr. at 9)

3

on past the house and down a block where Captain Guffey picked him up. (Tr. at 36)

11. After the walking surveillance, Captain Guffey and Detective Fugate contacted Detective Scott Chubick and other members of the task force to meet them at the Caldwell County Sheriff's Department. (Tr. at 37) The officers applied for a search warrant for Kenneth Richey's residence. (Tr. at 37) Deputy Thomas Clemens[2] of the Caldwell County Sheriff's Department provided background information for inclusion in the affidavit. (Tr. at 39) The Affidavit of Probable Cause, signed by Detective Fugate, provided in part:

G. That ephedrine based products and acetone are among the known chemicals used in the manufacturing of Methamphetamine. They are also regulated chemicals, along with many other known "precursors" listed in RSMO 195.400.

H. Based upon the investigation to date, your affiant knows the following:

a. On 11/25/03 Det. Tom Shroyer received information from Richmond Wal-mart that a white female purchased 2 boxes of pseuphedrine [sic], 4 bottles of HEET, and a eight pack of lithium batteries which were paid for by cash however the same white female purchased food items with a EBT card with the name of Candy Vanderpoole.[3]

b. Caldwell County, Deputy Thomas Clemens has knowledge that Candy Vanderpoole is known to frequent the residence at 200 West Center, Polo Caldwell County, Missouri.[4]

---

[2] Defendant alleges that Deputy Clemens is biased against him as Deputy Clemens' fiancé was dating defendant's son. (Defendant's Supplemental Suggestions in Support of Motion to Suppress Physical Evidence at 3) Detective Fugate testified that Deputy Clemens found out in June or July of 2004 that his wife was having an affair with defendant's son. (Tr. at 59) The information was obtained from Deputy Clemens for inclusion in the Affidavit months before Deputy Clemens found out about his wife and defendant's son. (Tr. at 59)

[3] Detective Shroyer testified that in May 2004, Candy Vanderpoole advised Detective Shroyer that she was married to Kenneth Richey, but that they were separated and that Vanderpoole had gotten an ex parte restraining order against Richey. (Tr. at 13, 16) However, despite the fact that Vanderpoole had a restraining order against Richey, they continued to have contact with each other. (Tr. at 16-17)

[4] Detective Fugate testified that at the time he prepared the Affidavit, he believed that Candy Vanderpoole was Kenneth Richey's girlfriend and that she had lived at this residence until she filed an ex parte against him. (Tr. at 58)

4

c. On 12/25/03 at 2223 hrs. Caldwell County Deputy Thomas Clemens stopped a silver colored Mercury bearing Missouri license 358-TFE occupied by a Beverly Copple W/Fe, 4/27/51 for a traffic violation. Beverly Copple submitted to a urine sample which was tested by Sgt. Sarah Eberhart of the Missouri State Highway Patrol and Beverly Copple urine sample tested positive for methamphetamine. Beverly Copple was interviewed by Deputy Thomas Clemens and she admitted getting methamphetamine for free from a Kenneth Richey and using the methamphetamine two hours prior to being stopped by Deputy Clemens. Beverly Copple further admitted Kenneth Richey was "cooking" methamphetamine.

d. On 2/04/04 at approx. 2315 hrs. Det. Tom Shroyer of the North Central Drug Task Force observed a white male and a white female enter the Wal-mart store in Richmond, Ray County, Missouri where he observed both male and female purchase a total of four boxes of Equate brand cold pills containing Ephedrine. The female and male were observed exiting the Wal-Mart store and entered a white colored Jeep bearing Missouri license 979-PMN, registered to Kenneth L. Richey on a 1993 Jeep address Box 902, Polo Missouri.

e. 2/04/04 at 2333 hrs. Sgt. Scott Enss and Deputy Chris Clariday of the Ray County, Sheriffs Department stopped the white colored Jeep at Spartan and South Street in Richmond Ray County, Missouri bearing Missouri license 979-PMN for investigation. The driver of the vehicle was identified as being Kenneth L. Richey W/M, 10/06/53, 200 W. Center, Polo Missouri. The passenger was identified as Mary Hudson W/Fe, 6/8/77, 1114 St. Louis Ave. Excelsior Springs, Missouri. They consented to a verbal consent to search and Sgt. Scott Enss observed the four boxes of pills and a Police scanner in the vehicle. This vehicle was released after the search was conducted.

f. On 2/05/04 at 0015 hrs. Captain Robert Guffey and Detective I.B. Fugate III drove by the residence located at 200 West Center Street, in Polo Caldwell County, Missouri. The white Jeep being Missouri license 979-PMN was parked toward the southwest corner of the residence.

g. On 2/05/04 at 0828 hrs. Captain Robert Guffey and Detective I.B. Fugate III drove east bound on West Center Street in Polo Caldwell County, Missouri and smelled a strong odor of what was believed to be ether toward the north side of the residence located at 200 West Center Street in Polo, Caldwell County, Missouri. Det. I.B. Fugate

III was dropped off and proceeded to walk past the residence of 200 West Center Street in Polo, Caldwell County, Missouri. Det. Fugate III smelled a strong odor of ether while walking by the driveway toward the northwest corner of the residence.

       h.      Mary Elizabeth Hudson W/F, 6/8/77 was sentenced 5/12/97 in Caldwell County, Missouri for a Class B felony, for Manufacturing of a Control Substance.

(Affidavit of Probable Cause (doc #34))

12. Detective Chubick was assigned to conduct surveillance of Kenneth Richey's residence while the search warrant application was being processed. (Tr. at 62) The surveillance began at 9:45 a.m. (Tr. at 63) Detective Chubick was conducting the surveillance from a grocery store parking lot approximately one block north of the residence. (Tr. at 62) The first time Detective Chubick saw the white Jeep was at 10:58 a.m. when Kenneth Richey parked next to Detective Chubick in the parking lot of the grocery store. (Tr. at 63) At 11:02 a.m., Richey exited the store, got in the Jeep and drove directly to his residence. (Tr. at 63) Detective Chubick testified that he did not smell the odor of ether while stationed in the grocery store parking lot. (Tr. at 62, 66)

13. Judge Chadwick, a Caldwell County judge signed a search warrant for 200 West Center Street in Polo, Missouri, at 1:15 p.m. on February 5, 2004. (Tr. at 40; Search Warrant Authorizing Search for Controlled Substances (doc #34))

14. The search warrant was executed in the early afternoon of February 5, 2004. (Tr. at 40) It was snowing. (Tr. at 51) Detective Fugate was assigned to perimeter security detail during the execution of the search warrant. (Tr. at 40-41) Detective Fugate testified that he could smell the strong odor of ether while performing perimeter security at approximately twenty to thirty feet from the residence. (Tr. at 41) Detective Chubick was also assigned to perimeter security detail during the execution of the search warrant. (Tr. at 64) Detective Chubick testified that when he got out to do his perimeter, he smelled the strong odor of ether. (Tr. at 64) Detective Chubick estimated that he was thirty to thirty-five feet away from the house when he smelled the ether. (Tr. at 65)

15. Detective Shroyer assisted in executing the search warrant. (Tr. at 13) Detective Shroyer was part of the entry team because he is a meth lab technician and would be able to identify a possible methamphetamine laboratory inside the residence. (Tr. at 13-14) Detective Shroyer testified that while running up to the residence, he noticed a very strong smell of ether. (Tr. at 14) Detective Shroyer was approximately thirty feet from the house when he smelled the ether. (Tr. at 27) Detective Shroyer notified the other officers that any subjects inside the residence needed to be taken

6

outside immediately and that the house needed to be vented as soon as possible. (Tr. at 14) Caldwell County deputies found Kenneth Richey in his bedroom and took him outside. (Tr. at 14) Detective Fugate talked to Richey by the back door and asked him if he needed medical treatment due to the fumes. (Tr. at 41) Detective Fugate also asked Richey if there was a meth lab inside the residence for officer safety. (Tr. at 41-42) Richey responded that he did not require medical treatment and that there was a meth lab in the bathroom closet with three or four open cans of ether in the closet. (Tr. at 42)

16. Detective Shroyer and a deputy went through the house opening up windows and doors to vent the residence. (Tr. at 14) Detective Fugate contacted the Polo Fire Department to bring their big industrialized fans to help ventilate the house.[5] (Tr. at 15, 41) Detective Shroyer donned protective equipment to enable him to go back inside the residence and start pulling out open containers that were inside the bathroom closet to assist in the ventilation. (Tr. at 15) The house was ventilated because the fumes are harmful to people and because there is a potential for explosion. (Tr. at 15) The officers stayed outside until it became safe to reenter the residence and work in a safe environment. (Tr. at 15) The residence was then searched and evidence was collected. (Tr. at 42)

17. Items removed from the bathroom closet included pitchers containing liquids, cans of ether, a pump garden sprayer, coffee filters, Liquid Fire, Morton salt and a couple of empty cans of ether. (Tr. at 43-44) Detective Fugate testified that based on his training and experience, he knows that these items are used in the manufacture of methamphetamine. (Tr. at 44) Detective Fugate further testified that the pump garden sprayer was probably being utilized as a hydrogen chloride generator for use in the final process of meth production. (Tr. at 43) A window fan was mounted to blow air out of the closet and into the attic. (Tr. at 44-45) Above the window fan was a layer of charcoal briquets 14 to 16 inches thick resting on a layer of foam rubber. (Tr. at 45) Detective Fugate testified that the fan, charcoal briquets and foam rubber appeared to be some type of filtering device to prevent the smell from leaving the residence. (Tr. at 45) It is common for people to create filtration devices in meth labs. (Tr. at 45)

### III. DISCUSSION

Defendant Richey seeks to suppress all physical evidence seized on February 5, 2004, from

---

[5]Roger Holt, Chief of the Polo Fire and Rescue Department, submitted an affidavit which states that he did not smell "Either" or Ammonia when he placed an exhaust fan in the front doorway of the Kenneth Richey residence. (See Defendant's Second Supplemental Suggestions in Support of Motion to Suppress Physical Evidence at Ex. A)

7

his residence located at 200 West Center Street, Polo, Missouri. (Motion to Suppress Physical Evidence at 1) In support of his motion, defendant argues:

1. The information in the Affidavit about Candy Vanderpoole on November 25, 2003, and about Beverly Copple on December 25, 2003, was stale and cannot support a determination of probable cause.

2. The allegation by Detective Fugate about the smell of ether during the morning hours of February 5, 2004, was a deliberate falsehood or a reckless disregard for the truth based on the wind that was blowing, the fact that Detective Chubick did not report the smell of ether while conducting surveillance.

3. The Affidavit does not mention what happened to Mary Hudson after the traffic stop nor does the Affidavit state whether the four boxes of cold pills were seized during the traffic stop or later observed at defendant's residence.

(Motion to Suppress Physical Evidence at 3-4)

Defendant raised the following additional arguments in supplemental briefing:

1. The alleged meth lab in the bathroom closet as described by the officers would not allow the odor of ether to escape from the closet.

2. Roger Holt, Chief of the Polo Fire and Rescue Department, did not smell ether when he placed an exhaust fan in the front doorway of the residence.

(Defendant's Second Supplemental Suggestions in Support of Motion to Suppress Physical Evidence at 2)

The United States Supreme Court has set forth the following with respect to what is required for a valid search warrant:

> The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." ... [T]his Court has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the 'things to be seized,' " as well as

8

the place to be searched.

Dalia v. United States, 441 U.S. 238, 255 (1979)(citations omitted).

The Court will first address defendant's contention that Detective Fugate deliberately misled Judge Chadwick. In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the Supreme Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

The evidence before the Court does not support defendant's argument that the allegation by Detective Fugate about the smell of ether during the morning hours of February 5, 2004, was a deliberate falsehood or a reckless disregard for the truth. Not only did Detective Fugate testify before the Court that he smelled the odor of ether, Detective Shroyer and Detective Chubick also testified that they smelled the odor of ether at approximately thirty feet away from the residence prior to the execution of the warrant. (See Fact Nos. 9, 10, 14 and 15, supra) The fact that Chief Holt did not smell the ether when he later brought a fan to the residence does not mean that the detectives could not have smelled it earlier. Detective Shroyer and a deputy went through the house opening up windows and doors to vent the residence prior to the Polo Fire Department being contacted to bring their big industrialized fans to help ventilate the house. (See Fact No. 16, supra) Defendant's argument that the officers could not have smelled the ether because the alleged meth lab in the bathroom closet as described by the officers would not have allowed the odor of ether to escape from the closet must also fail. Obviously, the filtering device was not effective.

9

It appears that defendant Richey is also arguing that Detective Fugate misled Judge Chadwick by omitting from his Affidavit what happened to Mary Hudson and/or the four boxes of cold pills after the traffic stop. The Affidavit states:

> The driver of the vehicle was identified as being Kenneth L. Richey W/M, 10/06/53, 200 W. Center, Polo Missouri. The passenger was identified as Mary Hudson W/Fe, 6/8/77, 1114 St. Louis Ave. Excelsior Springs, Missouri. They consented to a verbal consent to search and Sgt. Scott Enss observed the four boxes of pills and a Police scanner in the vehicle. This vehicle was released after the search was conducted.

(See Fact No. 11 at ¶ H-e, supra) The Court does not believe that Detective Fugate omitted any pertinent information from the Affidavit. No improper inferences can be drawn from the fact that Detective Fugate did not include that Mary Hudson was allowed to leave in the vehicle or that Detective Fugate did not know what became of the four boxes of cold pills.

The Court finds that defendant Richey did not meet his burden of establishing by a preponderance of the evidence that Detective Futage misled Judge Chadwick by omitting information from the Affidavit and/or by including information in the Affidavit that he knew to be false or would have known to be false, except for a reckless disregard for the truth.

Next, the Court will address defendant's argument that the information in the Affidavit about Candy Vanderpoole on November 25, 2003, and about Beverly Copple on December 25, 2003, was stale and cannot support a determination of probable cause.

The Supreme Court has recognized that, because of the Constitution's "strong preference for searches conducted pursuant to a warrant, an issuing judge's "determination of probable cause should be paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983). The Court went on to state:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before

> [it], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding" that probable cause existed.

Id. at 238-39.

In addition to the information about Candy Vanderpoole and Beverly Copple, the Affidavit contains information that on February 4, 2004, Kenneth Richey and Mary Hudson purchased a total of four boxes of cold pills containing ephedrine and that ephedrine based products are among the known chemicals used in the manufacturing of methamphetamine.. (See Fact No. 11 at ¶¶ G and H-d, supra) Further, the Affidavit provides that on February 5, 2004, Captain Guffey and Detective Fugate smelled a strong odor of ether coming from defendant Richey's residence. (See Fact No. 11 at ¶ H-g, supra) Finally, the Affidavit provides that Mary Hudson had a prior conviction for manufacturing a controlled substance. (See Fact No. 11 at ¶ H-h) The facts in the Affidavit which relate to Candy Vanderpoole and Beverly Copple provide background information and do not detract from the more recent information set forth above. As stated by the Eighth Circuit in United States v. Macklin, 902 F.2d 1320 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991):

> Appellants ... make a related probable cause argument, that the information contained in the affidavit of December 9, 1986, some of it dating to 1977, is stale. While the affidavit does contain information from the late 1970's and early 1980's, this information is provided as mere background, and its presence does not taint more recent information in the affidavit. We agree with the First Circuit that "[w]here recent information corroborates otherwise stale information, probable cause may be found." Emery v. Holmes, 824 F.2d 143, 149 (1st Cir. 1987). Most of the information in the affidavit of December 9, 1986, is from 1986, much of it from September through November of 1986. It would be ludicrous to find that an affidavit with such current information were stale merely because of the presence of earlier, historical information.

Id. at 1326.

11

The Court finds that Detective Fugate's Affidavit was adequate to support the issuing judge's determination of probable cause. However, even if probable cause did not exist for issuance of the warrant (which this Court does not believe to be the case), the <u>Leon</u> good faith exception would support the admissibility of the evidence seized pursuant to the warrant since it appears that the officers executing the warrant were acting in "objectively reasonable reliance" on a warrant issued by a neutral judge. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984); <u>United States v. Murphy</u>, 69 F.3d 237, 241 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 516 U.S. 1153 (1996). Judge Chadwick found probable cause for the issuance of the warrant.

The Eighth Circuit has set forth the following with respect to exceptions to good faith reliance:

> Ordinarily, a police officer cannot be expected to question a judge's probable cause determination. Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth. Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

<u>Murphy</u>, 69 F.3d at 241 (quoting <u>United States v. Gibson</u>, 928 F.2d 250, 253-54 (8th Cir. 1991)). Stated another way, there are four "exceptions" wherein reliance upon an invalid search warrant is per se unreasonable: (1) the affiant misled the judge by including information in the affidavit that the affiant knew was false or would have known was false, except for a reckless disregard for the truth; (2) no reasonably well-trained officer could rely on the warrant, as it was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) the judge wholly abandoned his neutral and detached position and acted as a rubber stamp; or (4) the warrant itself is so facially defective that the executing officer cannot presume its validity. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

12

The "exceptions" to good faith reliance do not apply in this case. As set forth above, the Court finds no evidence to suggest that the officers misled Judge Chadwick by omitting information from the affidavit and/or by including information in the affidavit that they knew to be false or would have known to be false, except for a reckless disregard for the truth. No evidence was presented to suggest that Judge Chadwick abandoned his neutral and detached position or acted as a rubber stamp. Further, the Court cannot find that the affidavit was so lacking any indicia of probable cause or the warrant so facially defective that the executing officers could not presume the warrant's validity.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying the Motion of Defendant Kenneth L. Richey to Suppress Physical Evidence (doc #29).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                   */s/ Sarah W. Hays*
                                                   SARAH W. HAYS
                                   UNITED STATES MAGISTRATE JUDGE